### O'REILLY DE CAMARA v. BROOKE.

#### (District Court, S. D. New York. February 27, 1905.)

1. OFFICERS OF UNITED STATES—CIVIL LIABILITY FOR TORTS—MILITARY GOVERNOR OF CUBA.

   The military governor of Cuba, appointed by and representing the United States during its temporary occupation of the island after the conclusion of peace, pursuant to the treaty of Paris, is not exempt from personal liability for a tort committed in his official capacity against an individual in the course of the civil administration of the affairs of the country.

2. SPANISH TREATY OF 1899 — MILITARY OCCUPATION OF CUBA — PROPERTY RIGHTS OF RESIDENTS.

   As alleged in her complaint, plaintiff, a Spanish subject, and resident of the city of Havana, through purchase by her ancestors was the owner of a hereditary alienable office created by the Spanish crown known as the "Alguacil Mayor of Havana," pertaining to which as a personal or property right was the exclusive franchise or right to conduct the slaughter of cattle in the city of Havana, which franchise had always been recognized by the Spanish government as a valuable property right, of which the owner could not be deprived without compensation. Defendant, while military governor of Cuba in 1899, during its occupancy by the United States, and in time of peace, by an executive order abolished the office, and transferred the appurtenant franchise to the city of Havana. Such order did not purport on its face to have been made in the interest of the public health or in the exercise of any police power, but, so far as appeared, the transfer was purely arbitrary. The treaty of Paris, pursuant to which the American occupation was held, provided that "the United States will, so long as such occupation shall last, assume and discharge the obligations that may under international law result from the fact of its occupation for the protection of life and property," and, further, that "the relinquishment of Spanish sovereignty shall not be held to impair the property or rights which by law belong to the peaceful possession of property of all kinds of private individuals of whatsoever nationality such individuals may be." *Held*, on demurrer, that plaintiff's franchise was private property within the protection of the treaty, and of which she could not lawfully be deprived without compensation; that the fact that such franchise was a monopoly, which would be void under the laws of the United States or by the common law, was immaterial, it being valid and protected by the law of Spain.

3. OFFICERS OF UNITED STATES—LIABILITY FOR PRIVATE PROPERTY TAKEN.

   If an officer of the United States takes the property of a private person for public use without compensation, he is liable in tort for the trespass, although the government may also be liable on an implied contract.

On Demurrer to Complaint.

Coudert Bros. (Paul Fuller and Frederick R. Coudert, of counsel), for plaintiff.

Charles W. Russell, Special Asst. Atty. Gen., for defendant.

HOLT, District Judge. This is a demurrer to a complaint on the ground that it does not state facts sufficient to constitute a

cause of action. The action is brought by the Countess of Buena Vista, a subject of the King of Spain, and a resident of the city of Havana, against Maj. Gen. John R. Brooke, who was, in the year 1899, military governor of the Island of Cuba, to recover damages caused to the plaintiff by an order of Gen. Brooke abolishing a right or franchise to slaughter cattle in the city of Havana, owned by the plaintiff. The action is brought in this court under the provisions of subdivision 16 of section 563 of the United States Revised Statutes [U. S. Comp. St. 1901, p. 459], which confers jurisdiction upon the United States District Courts of all suits brought by an alien for a tort in violation of the law of nations or of a treaty of the United States. The substantial facts alleged in the complaint are: That in 1728 an ancestor of the plaintiff purchased, with the consent and approval of the Spanish crown, an hereditary and alienable office known as the "Alguacil Mayor," or "High Sheriff," of the city of Havana, an office to which pertained certain purely official functions, such as the perpetual right of sitting as a member of the municipal council of Havana, and a certain personal and property right, consisting of the exclusive franchise or right to manage and conduct the slaughter of cattle in the city of Havana, and to charge for each head of cattle so slaughtered for use in said city at certain specified rates. That said office descended by inheritance to the plaintiff. That in 1859 the Spanish government promulgated a law or decree relating to municipalities in the Island of Cuba, which provided, in substance, for the extinction of the political functions of said office, and their transfer to a municipal council, to be elected, but which also provided that the emoluments or profits of the office should be valued and paid for, and that until such payment the holders of the office should continue in the receipt of its emoluments. That in 1878 the Governor General of Cuba published a decree, having the force of law, providing that the perpetual councilors should cease to perform any duties, and that their offices should no longer be counted among the offices of the municipal council, the members of which thereafter should be elected, but which also provided that the provisions of the law of 1859, directing that the perpetual councilors should not be deprived of any emoluments to which they were entitled until the proper indemnification therefor should be paid to them, should remain in force. That proceedings were taken for the condemnation of the property rights appurtenant to said office, but were never completed, and that the property rights remained in force and were exercised by the plaintiff down to the time of the Spanish War. That in performing such service the plaintiff employed some 70 workmen, 50 oxen, and more than 20 carts, and incurred great expense in the maintenance of the necessary instrumentalities. That on and prior to May 20, 1899, the whole Island of Cuba was under the military jurisdiction of the United States, in pursuance of the treaty of Paris of December 10, 1898, providing for the relinquishment of the Island of Cuba by the Spanish government, and its temporary occupation by the United States. That the said treaty contained the declaration that "the United States will so long as such occupation

shall last assume and discharge the obligations that may under international law result from the fact of its occupation for the protection of life and property," and, further, that "the relinquishment of Spanish sovereignty shall not be held to impair the property or rights which by law belong to the peaceful possession of property of all kinds of private individuals of whatsoever nationality such individuals may be"; that on said May 20, 1899, Brig. Gen. William Ludlow was governor of Havana, and that on that day, the said city of Havana and Island of Cuba being in profound peace, and completely subject to the dominion, authority, and administration of the United States under its pledge in said treaty for the protection of property and of all rights which by law belong to the peaceful possession of property by private individuals, Gen. Ludlow, without notice to the plaintiff, or affording her any opportunity to be heard, and without any complaint of the manner in which she was exercising her said rights and duties and conducting the slaughter of animals in Havana, issued an order by which he declared that the hereditary grant or privilege in connection with the service of the city slaughter house, of which the O'Reilly family, its grantees or lessees, were the beneficiaries by inheritance or purchase from the original grantee, was thereby terminated and declared null and void. That the city of Havana, through its authorized agents, should make provision for the execution of such services as should be necessary in connection with the care of the slaughter house, the killing of animals for food, and the delivery of meat to the local dealers in the city, and to that end should, by hire or purchase, procure such wagons, carts, and draft animals and engage such services as might be necessary for the purpose in question; and that the present owners of the abrogated privilege might seek in the courts the establishment and valuation of such equities or legal rights as they might believe themselves to possess. That the plaintiff appealed from this order to the defendant, Maj. Gen. Brooke, the military governor of Cuba. That the defendant thereupon, on August 17, 1899, issued an order affirming the order of Gen. Ludlow, abolishing the old alienated office known as "Alguacil Mayor of Havana," together with all rights, duties, and privileges pertaining thereto, denying the right of the claimants to receive any of the emoluments thereof, and providing that the municipal corporation of Havana might adopt proper measures to provide the necessary means of performing the municipal services theretofore discharged by the claimants to the ownership of said office. That by said orders the plaintiff was deprived of the rights and franchises granted to her by law, and was thereafter prevented from receiving the emoluments thereof. That the said act of the defendant was in violation of the said treaty, and contrary to an order of the President of the United States issued July 13, 1898, which provided as follows:

"Though the powers of the military occupant are absolute and supreme and immediately operate upon the political condition of the inhabitants, the municipal laws of the conquered territory, such as affect private rights of person and property and provide for the punishment of crime, are consid-

ered as continuing in force, so far as they are compatible with the new order of things, until they are suspended or superseded by the occupying belligerent, and in practice they are not usually abrogated, but are allowed to remain in force and to be administered by ordinary tribunals, substantially as they were before the occupation. * * * One of the most important and most practical problems with which it will be necessary to deal is that of the treatment of property. * * * Private property, whether belonging to individuals or corporations, is to be respected and can be confiscated only for cause."

That the act of the defendant in issuing said order was contrary to the Constitution and laws of the United States, and in violation of the provisions of the treaty of Paris, and of the said instructions of the President of the United States; that it was a confiscation of the plaintiff's property, and was wholly unlawful, tortious, and unauthorized on the part of the defendant; and that it was also in contravention of the said Spanish laws of 1859, and of said decree of 1878. Judgment is demanded for damages alleged to amount to $250,000.

The questions involved in this case are novel, and I have reached a conclusion with hesitation. The counsel for the defendant claims that the action of Gen. Brooke was a governmental act; that he, as Governor General, exercised in trust either the sovereignty of the people of Cuba or sovereignty as representative of the sovereignty of this country; that in him was the entire legislative, executive, and judicial power; and that for any act done by him in that capacity he is exempt from suit, under the general principle that any sovereign is exempt from private suit for a governmental act. There are undoubtedly cases in which persons exercising substantially sovereign authority in subordination to a sovereign power have been held exempt from liability.

Thus it was held that the East India Company was exempt from private suit in respect to the exercise of that portion of its power in India which consisted in the right to acquire, retain, and govern territory, to raise and maintain armed forces by sea and land, and to make peace or war with the native powers of India. Secretary of State in Council of India v. Kamachee Boye Sahaba, 13 Moore, P. C. 22, and cases there cited. So the Lord Lieutenant of Ireland has been held to be exempt from liability to private suit for acts done in his official capacity. Sullivan v. Spencer, Ir. R. 6 C. L. 173. But the general rule in England is well established that the governor of an English colony, in time of peace, is liable for any tort committed by him, unauthorized by law. Mostyn v. Fabrigas, 1 Cowp. 161. In Phillip v. Eyre, L. R. 6 Q. B. 1, the Governor of Jamaica was held exempt from liability because the colonial Legislature had passed an act of indemnity; but it was substantially admitted that but for such act he would have been liable to an action for torts alleged to have been committed in violation of law, although in that case the defendant asserted that the acts were done for the suppression of a mutiny, or a threatened mutiny. So it is well established that officers of the United States are personally liable for torts in violation of law, although done in good faith, and in supposed obedience to acts of Congress or the orders of superior officers. Little v. Barreme, 2 Cranch, 170, 2 L. Ed. 243; Mitchell v. Harmony, 13 How. 115, 14 L. Ed. 75; Bates v. Clark, 95 U. S. 204, 24 L. Ed. 471.

Similarly, public officers of any kind are liable personally in suits in tort to recover damages for illegal acts done in their official capacity. This rule has been applied to tax officers enforcing taxes under an unconstitutional state law. The Virginia Coupon Cases, 114 U. S., 5 Sup. Ct., 29 L. Ed., particularly Chaffin v. Taylor, 114 U. S. 309, 5 Sup. Ct. 924, 962, 29 L. Ed. 198; Carter v. Greenhow, 114 U. S. 317, 5 Sup. Ct. 928, 962, 29 L. Ed. 202. So actions in ejectment and detinue may be brought to recover property held without legal authority by officers of the United States, although held in behalf of the United States. Grisar v. McDowell, 6 Wall. 363, 18 L. Ed. 863; United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171. So a suit for the infringement of a patent may be maintained against an officer of the United States, personally, who infringes a patent while doing work in behalf of the United States. Belknap v. Schild, 161 U. S. 10, 16 Sup. Ct. 443, 40 L. Ed. 599.

I think, under these decisions, that the defendant is not exempt from personal liability in this action on the ground that his order was an exercise of sovereign power. His act was not an act done by a military commander in time of war. He is described in the complaint as the military governor of the Island of Cuba, but it is also alleged in the complaint that the city of Havana and Island of Cuba were in profound peace, and completely subject to the dominion, authority, and administration of the United States. The annulment by Gen. Brooke of the plaintiff's right to carry on the slaughtering business, and its transfer to the city of Havana, was not in its nature a military act, but was essentially an act done in the course of civil administration. The defendant's counsel claims that the plaintiff's right or franchise in the slaughtering business was a kind of private property, the protection of which, after the transfer of Cuba to this country, was not contemplated by the treaty. It was, in my opinion, clearly property. It was a grant from the crown of Spain, from which a valuable income was derived, and it was just as genuine property as if it had been a grant of land from which rents were derived. It was undoubtedly a kind of property which does not exist in this country. It was a pure monopoly. Every student of English history is familiar with the great controversies about monopolies between the crown and the English nation in the reigns of Elizabeth and James I, resulting in the decisions of the courts that they were void at common law, and the statute of monopolies declaring them illegal by act of Parliament. They have ever since been held, in England and this country, to be void at common law, and are now prohibited in this country by the fourteenth amendment to the Constitution. In the Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394, the state of Louisiana had incorporated a company, to which it gave the exclusive right to maintain stockyards and places for slaughtering cattle in a certain part of the city of New Orleans. The validity of that legislation was attacked, and the minority of the court were of the opinion that it was void, as creating a monopoly. The majority of the court, however, held that it was valid as an exercise of the police power, and that it did not create a monopoly, because any butcher who wished to carry on his trade was authorized to

do it at the company's establishment. But it was practically admitted in the opinion of the majority in that case that the trade of a butcher is a trade which, by the common law, any man is free to enter upon and to follow, and that an act of the Legislature conferring upon any particular person or company the right to carry on the trade of a butcher in any community, to the exclusion of all other butchers, would be void. But in many countries monopolies granted by the crown are a perfectly valid species of property. The complaint in this case alleges, and the demurrer admits, that the plaintiff's right or franchise always was and always has been recognized as private property by the Spanish law, and therefore, in the interpretation of the treaty, the plaintiff's right or franchise must be held to have been private property.

But it is claimed that, being a kind of property which is not recognized in this country, it could not have been within the contempla-tion of the parties to the treaty that it should be protected by this government after the relinquishment of sovereignty over Cuba and the transfer of possession to the United States. It is undoubtedly a kind of property which, by the law of this country, could be at any time abolished by the sovereign power. If such a franchise had been created in this country, it would have been void from the beginning as a monopoly. But it is well settled that the regulation of slaughter houses in thickly settled communities is a part of the police power (2 Kent's Com. 340; Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394); and if any part of such a grant, or any grant of a somewhat similar nature, under certain circumstances, might be upheld as a valid exercise of the police power, as occurred in the Slaughter House Cases, it is well settled that such a grant is not, in this country, protected by the constitutional provision rendering invalid any law impairing the obligation of contracts, and that any state which has granted any privilege in the nature of a monopoly under the police power has a perfect right to terminate such a grant at its option at any time. No state can grant or bargain away its right to exercise the police power. Butchers', etc., Co. v. Crescent City, etc., Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585. It is clear, therefore, that, if such a right or franchise as that of the plaintiff had been originally granted in this country in the exercise of the police power, it would have been in the power of the government to annul the grant in the exercise of the same power, and that is what the defendant's counsel claims was done in this case. But, in my opinion, there is nothing alleged in the complaint which justifies the inference that Gen. Brooke, in annulling this grant, was acting under the police power. It is true that his order recites as follows:

"It being considered prejudicial to the lawful interests and general welfare of the municipality of Havana, and as a measure demanded by public policy and in harmony with preceding orders of the military government, in view of the condition of affairs created in this island by the cessation of Spanish sovereignty, the old alienated office known as 'Alguacil Mayor de la Habana,' together with all rights, duties, and privileges pertaining thereto, or derived therefrom, are hereby abolished."

But this recital is entirely consistent with the view that there was nothing in the manner in which the business was conducted by

the plaintiff which called for the interference of the government for the protection of the public health, or for any of the objects for which the police power can justly be exercised. There was nothing in the order which provided for any change in the method of doing the business. The right or franchise was transferred, as it stood, to the city of Havana. So far as appears in the case, the reasons why it was considered prejudicial to the lawful interests and general welfare of the municipality of Havana, and why its transfer to the city of Havana was thought to be a measure demanded by public policy, may have been the fact that it was considered a valuable franchise, the profits of which it was deemed desirable that the city should receive. The complaint alleges that there was no complaint in respect to the management of the slaughter house, and that there existed no immediate or impending danger, or urgent necessity for the transfer. The demurrer admits these facts, and although, upon a trial, a contrary state of facts may appear, I think, upon the face of this complaint, it must be assumed that this transfer was not made in the interests of the public health or in the exercise of any police power, but was simply an arbitrary transfer of a valuable property from one person to another, without compensation.

The defendant's counsel also suggests that the defendant is not liable in this action, because the transaction gave rise to an action upon contract against the government either of Cuba or of the United States. It is well settled in this country that if the government, in violation of the provision of the Constitution, takes private property for a public use, without compensation, a cause of action arises against the government upon an implied contract to pay for it. United States v. Great Falls Mfg. Co., 112 U. S. 645, 5 Sup. Ct. 306, 28 L. Ed. 846; United States v. Lynah, 188 U. S. 446, 23 Sup. Ct. 349, 47 L. Ed. 539. If the only liability in such a case were one upon contract, obviously this court would have no jurisdiction of this case, for this court has no jurisdiction at common law of an ordinary claim on contract against an individual under any circumstances, or against the United States, except under the Tucker act, when the claim is less than $1,000. But if an officer of the United States takes the property of a private person for public use without compensation, I think he is liable in tort for the trespass, even if the government is also liable on contract. Hill v. United States, 149 U. S. 593, 13 Sup. Ct. 1011, 37 L. Ed. 862; United States v. Great Falls Mfg. Co., 112 U. S. 645, 5 Sup. Ct. 306, 28 L. Ed. 846; Langford v. United States, 101 U. S. 341, 25 L. Ed. 1010.

But, in my opinion, all the reasoning in this case based on the law and authorities governing the rights and obligations of parties to transactions taking place in the United States is more or less fallacious. The plaintiff's rights in this case are governed by the treaty with Spain, which, like all treaties, constitutes a part of the supreme law. That treaty provided that:

"The United States will so long as its occupation shall last assume and discharge the obligations that may under international law result from the fact of its occupation for the protection of life and property."

International law, as stated in the case of Strother v. Lucas, 12 Pet. 410, 9 L. Ed. 1137, provides that, in the case of the military conquest of a country—

"The conqueror does no more than displace the sovereign, and assume dominion over the country. A cession of territory is never understood to be a' cession of the property of the inhabitants. The king cedes only that which belongs to him. Lands he had previously granted were not his to cede. * * * No construction of a treaty which would impair that security to private property which the laws and usages of nations would, without express stipulation, have conferred, would seem to be admissible further than its positive words require."

So in More v. Steinbach, 127 U. S. 70, 8 Sup. Ct. 1067, 32 L. Ed. 51, it is said:

"By the cession of California to the United States the rights of the inhabitants to their property were not affected. They remained as before. Political jurisdiction and sovereignty over the territory and public property alone passed to the United States."

The provision in the treaty, therefore, that "the relinquishment of Spanish sovereignty shall not be held to impair the property or rights which by law belong to the peaceful possession of property of all kinds of private individuals of whatsoever nationality such individuals may be," applies to the property and rights of Spanish subjects in Cuba under Spanish law at the time. The relinquishment of sovereignty over the island must be deemed to have been in consideration of the provisions of the treaty by which the United States guarantied the protection of the private rights of property as they existed in Cuba. The question is not whether the plaintiff's right or franchise was property under the laws of the United States, which, under those laws, could be interfered with or abolished under the police power or any other power. The question is, was it property under the law of Spain? The complaint alleges that it was, and the Spanish acts and decrees set forth in the complaint show that the government fully admitted that, until the plaintiff was compensated for the value of her franchise, her right and property in it was valid and indefeasible. The Spanish Civil Code, as set forth in the complaint, provides as follows:

"Art. 349. No one shall be deprived of his property, unless it be by competent authority, and with justified cause for public utility, and never until he has previously been properly indemnified.

"If this requirement has not been complied with, the judges shall protect, and, in proper cases, replace the condemned party in possession."

"Art. 336. As personal property, are also considered rents or pensions, either for life or hereditary, in favor of a person or family; also purchased public offices, contracts for public services," etc.

I think it clear from these provisions that under the Spanish law, before the plaintiff could be deprived of her rights in this franchise, its value must have been determined and paid to her.

My conclusion is that the demurrer should be overruled, with leave to the defendant to answer within 20 days upon payment of costs.