O'REILLY DE CAMARA v. BROOKE, Major General.

(District Court, S. D. New York. January 11, 1906.)

1. NUISANCE—ABATEMENT—SLAUGHTERHOUSE—ABOLITION OF PRIVATE FRANCHISE.

Plaintiff was the hereditary owner through a grant from the Spanish government of the exclusive franchise to slaughter cattle in the city of Havana, and maintained a slaughterhouse, the offal from which was discharged into a creek which passed through a portion of the city and emptied into the harbor. By reason of such offal and also of sewage discharged into the creek it became a public nuisance dangerous to health. *Held* that, while such facts authorized the abatement of the nuisance by the public authorities in the exercise of the police power, they did not justify the abolition of plaintiff's franchise by the United States military governor of Cuba as an exercise of such power; it being shown that the slaughterhouse itself was kept in a sanitary condition and was not dangerous to the public health.

2. UNITED STATES—MILITARY GOVERNOR OF CUBA—LIABILITY FOR OFFICIAL ACTS.

Defendant, while governor of Cuba during its occupation by the United States, abolished a valuable franchise owned by plaintiff, who was a Spanish subject. On appeal the Secretary of War of the United States confirmed the governor's order. Subsequently, by the so-called "Platt

Amendment," incorporated in the treaty between the United States and the Republic of Cuba, it was provided that "all acts of the United States in Cuba during its military occupancy thereof are ratified and validated and all lawful rights acquired thereunder shall be maintained and protected." *Held,* that such ratification was equivalent to an original authorization of defendant by the United States government to make the order in question and exempted defendant from any personal liability to plaintiff for depriving her of her property right in the franchise, and transferred such liability, if any, to the United States, or to the government of Cuba.

Coudert Bros. (Paul Fuller, Frederic R. Coudert, and Crammond Kennedy, of counsel), for plaintiff.

Charles W. Russell, Asst. Atty. Gen., for defendant.

HOLT, District Judge. This action was brought by the Countess of Buena Vista, a subject of the King of Spain, residing in Havana, Cuba, against Maj. Gen. John R. Brooke, to recover damages alleged to have been caused to the plaintiff by an order of Gen. Brooke, made August 10, 1899, when he was military governor of the Island of Cuba, abolishing the right or franchise to slaughter cattle in the city of Havana, owned by the plaintiff. A demurrer was originally interposed to the complaint, and overruled. The substantial facts alleged in the complaint are stated in the opinion on the demurrer. O'Reilly de Camara v. Brooke (D. C.) 135 Fed. 384. After the decision of the demurrer an answer was interposed, evidence taken, and the cause brought on for final hearing upon the pleadings and proofs. Upon the argument some of the defenses which were raised by the demurrer have been referred to, but I have seen no ground to change the views stated in the opinion upon the demurrer. The evidence, however, has brought before the court facts which did not appear upon the face of the complaint, which are claimed to be defenses to the action. These defenses are, in substance, that the abolition of the plaintiff's right or franchise to slaughter cattle in Havana was justified as an act under the police power, in the interests of the public health, and that, the United States government having ratified the action of Gen. Brooke in abolishing the plaintiff's right or franchise, the plaintiff has no longer any claim against Gen. Brooke, for the damages alleged in the bill.

The substantial facts upon which it is alleged that the order of Gen. Brooke was justified as an exercise of the police power for the protection of the public health are these: The slaughterhouse, in which the killing of cattle, under the concession to the plaintiff, was carried on, was established many years ago, by the side of a creek emptying into the harbor of Havana. It was, when established, well outside the settled limits of the city. It was admitted by counsel upon the argument that the real estate constituting the slaughtering establishment had always belonged to the city. A ditch or small canal led from the slaughterhouse to the creek, and all the offal from the slaughtering of animals was for many years discharged into the creek through this canal. The creek was also a general receptacle for sewage of all kinds from the houses on its banks. The result was that

for many years the creek, and particularly its mouth and the part of the bay adjacent, was filled with a decaying and offensive mass of offal and sewage. In the meanwhile, the city had extended until,. at the time of the American occupation, a large number of people of the poorest class, lived in the vicinity of the creek. The general conditions of the health of that portion of the city were very bad. A hospital existed there, in which the death rate was 60 per cent. of all the patients admitted, and the evidence clearly shows, as might have been inferred without evidence, that the filthy condition of the creek, and of the bay around its mouth was in a very high degree deleterious to the public health. Soon after the American occupation began, Gen. Ludlow, the governor of Havana, instituted general measures for cleaning the city, and one of the principal things which he did was to remove the accumulated filth in and at the mouth of the slaughterhouse creek. A gang of men, with special apparatus provided for the purpose, removed the offensive matter and deodorized it. About 1,000 tons of lime were used for the purpose. The discharge of the offal from the slaughterhouse through the canal and creek was discontinued, and it was thereafter removed in carts, and properly disinfected. Thereafter the general condition of the slaughterhouse itself was good. A commission which investigated its management reported that it was "businesslike and efficient." In January, 1899, the governor appointed a finance commission, to consider and report, among other things, upon the sources of city revenue. That commission made a report in March, 1899, in which it referred in detail to the income of the city, and particularly to the income received from water rents and slaughterhouses. It reported, in substance, that the water supply and the right to slaughter cattle had both been conceded to individuals by the Spanish government, and that but for the private rights of such individuals they would afford a basis of taxation for increased revenues to the city. Thereafter Gen. Ludlow issued orders abolishing the private rights of the owners of these concessions, and turning over the administration of the water supply and of the slaughtering of animals to the municipal authorities, with the result of a large increase in the city revenues from those sources. In my opinion, the evidence establishes that, although the filth in the slaughterhouse creek before the American occupation had been a public nuisance, justifying any action necessary on the part of the authorities, under the police power, to abate it, it was no part of the duty of the plaintiff, under her right to slaughter cattle, to abate it; but it was the duty of the public authorities to keep the creek clean and uncontaminated, as a part of their general duty to provide for the removal of filth, and for adequate sewerage for the city at large. It was the plaintiff's duty to keep the slaughterhouse clean and wholesome, and the evidence shows, in my opinion, that she did so. I think that the real object of Gen. Ludlow in abolishing her concession was to make it possible to increase the city revenue, and not to improve the public health. It appears, on the evidence, that the main reason why Gen. Brooke issued his order of August 10th was that he was advised that, as a legal question, it was doubtful whether Gen. Ludlow had authority to make the order which

he had made on May 20th, and it was deemed advisable that the concession should be abolished by unquestionable authority. I think, however, that Gen. Brooke, when he made the order, was partly actuated by the idea that he was justified in making it for the protection of the public health, he having a general impression that the plaintiff was legally responsible for the former condition of the slaughterhouse creek. In view of all these circumstances, I do not think that the order of Gen. Brooke of August 10th can be justified as a valid exercise of the police power. The thing which the order abolished was not the particular slaughterhouse where the plaintiff had carried on the business, but was the right to slaughter cattle at all. The city authorities, after the order abolishing the plaintiff's right was issued, carried on the same business, in the same slaughterhouse, and employed the same manager who had conducted the business for the plaintiff. If the maintenance of the slaughterhouse at that place for any reason was objectionable, it was in the power of the city to have established another sufficiently far from the settled limits of the city to constitute no nuisance. Indeed, under modern methods of conducting the business of slaughtering cattle, in which the entire products of the business are saved and utilized for commercial purposes in various ways, there is no longer any reason why any slaughterhouse should constitute a nuisance to the neighborhood in which it is placed.

The remaining defense relied on in this case is that the United States government ratified the action of Gen. Brooke, and that, therefore, whatever claim the plaintiff has is a claim against the United States, or the Republic of Cuba, and not against Gen. Brooke. The evidence upon this subject, in substance, is that, after Gen. Brooke's order was promulgated, the plaintiff appealed to the Secretary of War, and thereupon the Secretary of War made a decision or order, of which the following is a copy:

"In the matter of the application of the Countess of Buena Vista for revocation of certain order of the military governor of Cuba. I cannot assent to the proposition that the right to perform any part of the duties, or receive any part of the compensation attached to the office of sheriff of Habana under Spanish sovereignty, constitutes a perpetual franchise which could survive that sovereignty. The fact that the Spanish Crown permitted an office to be inherited or purchased does not make it any less an office the continuance of which is dependent upon the sovereignty which created it. The services which the petitioner claims the right to render and exact compensation for are in substance an exercise of the police power of the state. The right to exercise that power under Spanish appointment or authority necessarily terminated when Spanish sovereignty in Cuba ended. It thereupon became the duty of the military governor to make a new provision under which this part of the power of the new sovereignty, which took the place of the sovereignty of Spain, should be exercised, and the necessary service rendered to the public. The petitioner has been deprived of no property whatever. The office, right, or privilege which she had acquired by inheritance was in its nature terminable with the termination of the sovereignty on which it depended. The question whether by reason of anything done before that time the right to compensation from the municipality of Habana has arisen is a question to be determined by the courts of Cuba. The application for the revocation of the order heretofore made herein by the military governor of Cuba is denied.

"December 24, 1900.

"Elihu Root, Secretary of War."

In an act making appropriations for the support of the army, passed March 2, 1901 (31 Stat. 897, c. 803), a provision was inserted, commonly called the "Platt Amendment," which provided that the President was authorized to "leave the government and control of the Island of Cuba to its people so soon as a government shall have been established in said island under a Constitution which * * * shall define the future relations of the United States with Cuba" in certain respects, one of which was "that all acts of the United States in Cuba during its military occupancy thereof are ratified and validated, and all lawful rights acquired thereunder shall be maintained and protected." This provision, with the other provisions of the Platt amendment, was incorporated in the treaty with Cuba of May 22, 1903 (33 Stat. 2249), and as such is a part of the supreme law of this country.

I think it must be conceded that if the United States government had originally authorized and directed Gen. Brooke to issue the order of August 10th, the United States government, and not Gen. Brooke, would have been responsible to the plaintiff. If, for instance, Congress had passed an act abolishing the plaintiff's hereditary right to slaughter animals in Havana, and had directed Gen. Brooke to carry it out, no one, in my opinion, could claim that Gen. Brooke was personally liable in damages for obeying the order of the government. But it is well settled that a subsequent ratification by a government of an official act of its officer is equivalent to original authority. Buron v. Denman, 2 Exch. 167; The Rolla, 6 Rob. Adm. 364; Secretary of State in Council of India v. Kamachee Boye Sahaba, 13 Moore, P. C. 22.

In Buron v. Denman, 2 Exch. 167, the defendant, a commander in the English navy, was sued for damages for freeing certain slaves and destroying certain slave barracoons or factories on the west coast of Africa, owned by a Spaniard. By the laws of Spain, his ownership of the slaves liberated and property destroyed was valid, and the defendant's act, under the English authorities, was admittedly illegal. After the defendant's action he made a report of it to the Admiralty, and the Admiralty reported the transaction to the English Foreign Office. Thereupon Lord Palmerston, Minister for Foreign Affairs, issued an order approving the conduct of Commander Denman, and it was held that this amounted to a ratification of his action by the English government, and the suit was dismissed on that ground.

In The Rolla, 6 Rob. Adm. 364, an American ship and cargo was proceeded against for a breach of a blockade. It was claimed as a defense that the blockade was illegal. In reply to this argument, Sir William Scott said:

"However irregularly he [the British commander] may have acted towards his own government, the subsequent conduct of government in adopting that enterprise, by directing a further extension of that conquest, will have the effect of legitimating the acts done by him, so far at least as the subjects of other countries are concerned."

In Secretary of State v. Kamachee Boye Sahaba, 13 Moore, P. C. 22, an agent of the East India Company, upon the death of the Rajah of Tanjore, decided that his office was extinct, and that his private

property passed to the East India Company. This decision was ratified and approved by the Council. The principle decided is stated in the syllabus:

"An act done by an agent of the government, though in excess of his authority, being ratified and adopted by the government, held to be equivalent to previous authority."

The action of the Secretary of War on the appeal taken to him by the plaintiff, in my opinion, must be held to be a ratification of the action of General Brooke by the government of the United States, as the order of Lord Palmerston, approving the conduct of Commander Denman, was held to be an act of the government of England. It presents perhaps a stronger case of ratification by the government than some of the other cases cited. Moreover, the passage by Congress of the act containing the Platt amendment, and the adoption of the treaty with Cuba containing it, was an express ratification, by the highest authority, by the government of the United States, or of Cuba, or of both, of all acts of American officers and agents during the occupation of Cuba by the United States forces. It was, in my opinion, equivalent to a general act of indemnity, which, upon general principles, would have barred an action against the defendant. Phillips v. Eyre, L. R. 6 Q. B. 1. If there be any doubt whether, under constitutional guaranties, a vested claim of a citizen of the United States could be affected by such governmental action, there can be none, I think, as to the effect of such action upon a claim held by an alien.

In my opinion, the plaintiff has a just claim for damages, for the destruction of her property, against the United States, under its obligations assumed in its treaty with Spain, or against Cuba, under its obligations assumed in its treaty with the United States, or against both governments, but she has no longer any right of action remaining against the defendant.

My conclusion is that the complaint should be dismissed, with costs.