# UNITED STATES *v.* GREAT FALLS MANUFACTURING COMPANY.

## APPEAL FROM THE COURT OF CLAIMS.

Argued December 1, 1884.—Decided December 22, 1884.

Where property to which the United States asserts no title, is taken by their officers or agents, pursuant to an act of Congress, as private property, for the public use, the government is under an implied obligation to make just compensation to the owner.

Such an implication being consistent with the constitutional duty of the government, as well as with common justice, the owner's claim for compensation is one arising out of implied contract, within the meaning of the statute defining the jurisdiction of the Court of Claims, although there may have been no formal proceedings for the condemnation of the property to public use.

The owner may waive any objection he might be entitled to make, based upon the want of such formal proceedings, and, electing to regard the action of the government as a taking under its sovereign right of eminent domain, may demand just compensation for the property.

This was an appeal from a judgment in favor of the Great Falls Manufacturing Company, a corporation of the State of Virginia, for the sum of $15,692 as compensation for all past and future use and occupation by the United States of certain land, water rights and privileges claimed by that company, and all consequential damages which it may legally assert by reason of the execution of a certain one of the plans adopted by the government for supplying the cities of Washington and Georgetown with water.

The case made by the finding of facts is, in substance, as will be now stated :

On the 31st of August, 1852, Congress appropriated $5,000 to enable the President to cause the necessary surveys and estimates to be made for the best means of supplying those cities with good and wholesome water. 10 Stat. 92, ch. 108. In execution of that act, President Fillmore transmitted to Congress the report of General Totten, of the Corps of Engineers, recommending the construction of an aqueduct from the Great Falls of the Potomac, situated in the State of Maryland, about sixteen miles distant from Washington. The Great Falls form a series of rapids extending for about one-half or three-fourths of a mile, in the course of which the river falls about seventy feet ; from which to the tide-level at Washington there is a further fall of about seventy feet. Just above these rapids is Conn's Island, lying near the Maryland shore, and distant about 1,400 feet from the Virginia shore. At its head, extending up the stream, are several small islands called the Cyclades, separated from each other and Conn's Island by narrow channels. On the Virginia side, is a body of land known as

the Toulson Tract, extending along the river from a point op-posite the middle of Conn's Island to a point below the Great Falls, and running back a distance of about half a mile. A considerable portion of it is elevated ground, well adapted to the construction of mills and manufactories, which may be supplied with water power from the river, and by canals, races or other artificial water ways. Before the construction by the government of the dam and other works to be presently referred to, Conn's Island divided the Potomac River into two unequal channels, about ninety-eight per cent. of the water passing through the Virginia channel, and two per cent. through the Maryland channel, at low stages; the total flow at low water being estimated at about 1,065 cubic feet per second, or 700,000,000 gallons daily. Of these lands, water rights and privileges, the Great Falls Manufacturing Company claimed to be the owner, at and prior to the before-mentioned appropriation of $5,000.

On the 3d of March, 1853, Congress appropriated, " to be expended under the direction of the President of the United States, for the purpose of bringing water into the city of Washington upon such plans and from such places as he may approve, one hundred thousand dollars: *provided*, that if the plan adopted by the President should require water to be drawn from any source within the limits of Maryland, the assent of the legislature of that State should first be obtained." 10 Stat. 206, ch. 97.

On the 3d of May, 1853, the legislature of Maryland passed an act giving her assent to the purchase by the United States of such lands and to the construction of such dams, reservoirs, buildings and other works, within her limits, as might be required under any plan adopted by the President for supplying Washington with water. That act provided that, if the United States could not agree with the owners for the purchase of land, earth, timber, stone or gravel required for the construction of such works, or in case the owner thereof should be a *feme covert* or under age, *non compos mentis*, or a non-resident, " it shall, nevertheless, be lawful for the United States to enter upon such lands and to take and use such materials, after hav-

ing first made payment or tendered payment for the same at the valuation assessed thereon," in the manner prescribed in that act; also, that before the act should take effect, the United States "shall agree to such conditions as the Chesapeake and Ohio Canal Company may consider necessary to secure the canal from injury in carrying into effect any plan that may be adopted for supplying the city of Washington with water as aforesaid."

Then followed certain appropriations by Congress for the purpose of executing the said plan : $250,000 "for continuing the work on the Washington Aqueduct," act of March 3, 1855, ch. 175, 10 Stat. 664 ; $250,000, or so much thereof as was necessary, "for paying existing liabilities for the Washington Aqueduct, and preserving the work already done from injury," act of August 16, 1856, ch. 129, 11 Stat. 86 ; and $1,000,000 "for continuing the Washington Aqueduct," act of March 3, 1857, ch. 108, 11 Stat. 225.

By an act entitled "An Act to acquire certain lands needed for the Washington Aqueduct, in the District of Columbia," approved April 8, 1858, 11 Stat. 263, ch. 14, it was, among other things, provided :

"Whereas it is represented that the works of the Washington aqueduct, in the District of Columbia, are delayed in consequence of the proprietors' refusal, in some cases, to sell lands required for its construction at reasonable prices, and because in other cases the title to the said land is imperfect, or is vested in minors or persons non compos mentis, or in a feme covert, or [in persons] out of the District of Columbia ; and whereas it is necessary for the making of said aqueduct, reservoirs, dams, ponds, feeders, and other works, that a provision should be made for condemning a quantity of land for the purpose : Therefore,

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That it shall and may be lawful for the United States, or its approved agent, to agree with the owners of any land in the District of Columbia through which said aqueduct is intended to pass for the purchase or use and occupation thereof ; and in case of dis-

agreement, or in case the owner thereof shall be a feme covert, under age, non compos, or out of the District of Columbia, on application to a judge of the circuit court of said District, the said judge shall issue his warrant, under his hand, to the marshal of the said District to summon a jury." . . .

The rest of the act was limited to mere details.

On the 12th of June, 1858, the further sums of $800,000, and so much of the $250,000 as was not used under the act of August 18, 1856, were appropriated "for the completion of the Washington Aqueduct." 11 Stat. 323, ch. 154. Thereafter, on the 27th of July, 1858, proceedings were commenced by the United States, before a justice of the peace in Maryland, for the assessment of the damages which the dam of the Washington Aqueduct proposed to be constructed at the Great Falls should cause to the appellee, of which the latter had due notice. The damages were assessed at $150,000; but, in November of the same year, the inquisition, upon the application of the United States, was set aside by the Circuit Court of Montgomery County, Maryland, and another one was ordered. But there was no further prosecution of these proceedings.

By an act approved March 3, 1859, 11 Stat. 435, ch. 84, the dams, aqueducts, water-gates, reservoirs, and all improvements connected therewith, constructed or to be constructed by the United States for the conveyance of water from the Potomac River, above the Great Falls, to the cities of Washington and Georgetown, were directed to be placed by the President "under the immediate care, management, and superintendence of a properly qualified officer of the United States Corps of Engineers to be appointed by him, who shall act under the Department of the Interior," &c.—his decision "to be subject only to appeal to the Secretary of the Interior."

On the 25th of June, 1860, Congress appropriated the sum of $500,000 for the aqueduct, "to be expended according to the plans and estimates of Captain Meigs and under his superintendence." 12 Stat. 106, ch. 211.

On the 20th of November, 1862, articles of agreement were executed between the Secretary of the Interior, in the name of

the United States, and the Great Falls Manufacturing Company, wherein was recited the claim of the latter for compensation for the use by the former of certain lands and water rights at the Great Falls, the cost that would ensue to both parties from any further delay in the settlement of their differences, and the anxiety of the government to prosecute the work in question; and whereby such claim was referred to arbitrators, one of whom was the late Benjamin R. Curtis, with power to examine into, decide upon, and award such compensation, if any, as the claimant may be entitled to for the use and occupation of said land and water rights, and all consequential damages that the company might legally claim by reason of the execution of the several plans adopted by the government in the location and construction of the dams and other works of the Washington Aqueduct. Pursuant to this agreement, the United States and the claimant appeared by counsel before the arbitrators, witnesses were examined, and documentary evidence was submitted by the respective parties.

At the hearing, the Great Falls Manufacturing Company filed with the arbitrators a specific description of the lands to which they asserted title, and which they claimed would be affected by the improvements made, or proposed to be made. The United States filed the specifications of their proposed plans of operations, being four in number. The arbitrators made an award in writing on the 28th of February, 1863, all the costs and expenses of which, including $12,000, the amount of compensation charged by them, were paid by the Secretary of the Interior out of the appropriations for the completion of the Washington Aqueduct. By the award it was determined that the amounts to which the company was entitled, as compensation and damages for the use and occupation by the United States of the land, water rights and privileges claimed by it, were as follows: If the first plan of improvements was carried into execution, $63,766; if the second $50,000; if the third, $77,200; if the fourth, $15,692. The fourth plan involved the construction of a dam of masonry from the Maryland shore to Conn's Island, and gave the United States the right to deepen the channel on the Maryland side of Conn's Island near its

head, so as to supply the aqueduct with whatever quantity of water the dams would yield.

The claimants presented to the arbitrators title deeds and proofs showing a valid title in it to the Toulson Tract, Conn's Island, and the Cyclades. Objections were presented and urged on behalf of the United States, but the arbitrators held the title of claimants to be valid and satisfactory. No other title than that of claimant was asserted.

The conduit through which the water supply of the city of Washington is drawn was completed on the 5th of December, 1863.

On the 4th of July, 1864, Congress appropriated the sum of $150,000 " for the purpose of constructing *the dam of solid masonry across the Maryland branch of the Potomac River, near the Great Falls,* and for constructing the conduit around the receiving reservoir, and for paying *existing liabilities* and expenses, engineering, superintendence and repairs of said aqueduct." 13 Stat. 384, ch. 244.

On the 30th of July, 1864, the United States entered into a contract for the construction of that dam, and, proceeding to construct it, took possession of so much of Conn's Island as was required for the purpose of securing the dam and making a permanent abutment for it. And on July 28, 1866, the further sum of $51,687 was appropriated " to complete the dam in the Potomac River at the head of the aqueduct, from the shore to Conn's Island, with cut stone." 14 Stat. 316. The dam so constructed was about 1,176 feet long. It extended from a point on the Maryland shore, just below the feeder or mouth of the aqueduct, across the channel between Falls Island and Conn's Island, to its abutment on the latter island, closing the Maryland channel of the river entirely across. It was constructed substantially in conformity with the fourth of the alternative plans presented to the arbitrators by the United States. Conn's Island, in connection with the Maryland shore and the dam, formed such a basin as was necessary for the purpose of supplying the aqueduct, having its upper end open to receive the flow of the water as needed. There was no other island or natural formation which could be utilized for forming a

suitable basin without carrying the aqueduct much farther up the river. So that if that island was not used it would be necessary to incur the expense of a larger aqueduct and to carry the dam across to the Virginia shore, either above or below the island, or build some structure to take the place of the island. From any point below the rapids the elevation was insufficient to admit of the distribution of water by aqueduct; but there was sufficient elevation for that purpose from any point above them. The uses of the aqueduct required the entire flow of the water in the Maryland channel in the low stages of the river. The water drawn through it was distributed in the cities of Washington and Georgetown for the use of the government in its buildings, navy yard, fountains, &c., and for the municipal and domestic uses of the said cities and their inhabitants. The cost of the present dam was $77,250, while that of the aqueduct was nearly $4,000,000.

It was also found as a fact that the value of the water for the uses to which this was applied was derived from its elevation, which would admit of its flow or descent through the city; and when found at sufficient elevation to admit of being distributed by its natural flow, it possessed great value, and was paid for by cities, when taken from the control of private owners, according to its value.

Upon this state of facts, the Court of Claims found, as a conclusion of law, that the claimants were entitled to the judgment from which the present appeal was prosecuted. See 16 C. Cl. 160.

*Mr. Solicitor-General* and *Mr. John S. Blair* for appellant.— Neither the President, nor the Secretary of the Interior was authorized by any statute to contract for lands required for the dam; that the words of the statutes conferring a power to contract are limited to land required for the aqueduct proper. But even if such authority existed, the statutes conferred upon the President or Secretary no power to bind his own official discretion as to price, &c., by delegating that discretion substantially to third persons. He might have taken information, through Mr. Curtis and the other referees, or in any other way,

and might pay for such information; but he had no power to substitute their judgment for his own. The award, therefore, if it can be called an award, did not bind the Secretary or, consequently, the United States. No matter what its words were, a subsequent positive assent thereto by the Secretary was necessary to give it the force of an agreement. *Ut res magis valeat,* the award in this case is to be read as being merely information to the Secretary upon the question of value. That this was indeed the actual understanding of both parties at the time of the delivery of the award, is suggested by the very recent date of the amended claim.—Under the acts, the decision of the Attorney-General upon the title was necessary, before the claimant could recover. The claim of the defendant in error proceeds upon the theory of a contract of purchase and sale. It is submitted that if this had been a contract between private parties, the onus of producing and showing valid title would rest upon the vendor, and therefore would have to be alleged and proved in any suit depending upon the existence of such title; and also that in a suit for the price, an actual delivery of title-deeds, or the doing of something equivalent to delivery (tender, or the like), is indispensable. Also, that in conveyances to the United States, there is by statute no equivalent for a title pronounced valid by the Attorney-General; and, a circumstance which perhaps adds no legal force to the above proposition, although otherwise it is impressive, these parties expressly recognized that principle. The United States cannot be compelled to accept of an estate by estoppel, whether by judgment or otherwise; supposing (what is not admitted) that this record is competent to convey that. They require and should have a title good against the world, not merely against the claimant.

*Mr. Benjamin F. Butler* (*Mr. Charles F. Peck* was with him) for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court. He recited the facts as above stated, and continued:

The articles of agreement of November 20, 1862, between

the Secretary of the Interior and the Great Falls Manufacturing Company, made ample provision for the protection of the public interests; for, the right was reserved to the party dissatisfied, to proceed by suit in equity in the proper court of this District, for the purpose of having the award set aside or changed, and of obtaining such a decree, subject to review by this court, as was just and equitable. There is no doubt of the good faith of the effort of the parties to accommodate their differences, or that it was of the highest importance to the government that the obstacles should be removed to the successful completion of the work, upon which large sums had been expended. In the opinion of the court below, and in the arguments of counsel, the authority of the Secretary of the Interior to make the government a party to that agreement is discussed. But, in the view we take, it is unnecessary to determine that question. Our decision may be satisfactorily placed on other grounds.

From the report and documents transmitted to Congress by President Fillmore, it appears that, in the judgment of the Engineer Department, the best mode of supplying the cities of Washington and Georgetown with wholesome water, was by an aqueduct from the Great Falls of the Potomac; also, that such a plan necessarily involved the construction of a dam at that point in the river. Ex. Doc. (Senate) No. 48, pp. 2, 35, 48, 32d Cong. 2d Sess. By the annual report, under date of December 4, 1863, of Mr. Usher, Secretary of the Interior, Congress was informed that " certain parties having from time to time made claim to heavy damages for the diversion of the water from the Potomac River," his immediate predecessor, " with a view to settle and end this claim, entered into an agreement of arbitration with the claimants." The parties referred to were the present claimants, as appears by the agreement of arbitration, by the official documents submitted to Congress, and by the proceedings in the courts of Maryland for an assessment of the damages which the proposed dam should cause to the Great Falls Manufacturing Company. The Secretary said: " Pursuant to this agreement, the arbitrators met from time to time, and finally submitted their award, by which they adjudged in

favor of the claimants upon each and all of the plans and modes submitted to them, being three [four] in number, for the construction of the dam across the Potomac, and also $12,000 for their own fees as arbitrators, and $761.84 for the expenses of arbitration. The sums being large, I did not feel justified in applying the existing appropriation for the completion of the aqueduct to the payment thereof, preferring to submit the whole matter to Congress for its determination. It appears from the report of the experienced engineer in charge of the work, as must be obvious to every observer, that an ample supply of water for the use of the cities of Washington and Georgetown, for many years to come, can be obtained from the Potomac by the erection *of a tight dam, extending from the Maryland shore to Conn's Island,* to a height which will give a head of six feet in the aqueduct, and yield a daily supply of 65,000,000 gallons," etc. After expressing the opinion that such a dam could not work injury to the proprietors of the water rights claimed at the Great Falls, the Secretary recommended that a reasonable sum be appropriated to pay the expenses of the arbitration, and that the cost previously estimated of a dam across the main channel be diminished to that of the proposed dam over the east channel.

In conformity with that recommendation, Congress, by the act of July 4, 1864, made the appropriation of $150,000 for the purpose of constructing the proposed dam of solid masonry, and for paying the existing liabilities and the expenses connected with the engineering, superintendence, and repairs of the aqueduct. Immediately thereafter a contract was made for the construction of that dam. In his next annual report, under date of December 5, 1864, the Secretary informed Congress that the work upon the dam and the aqueduct required the expenditure of the additional sum of $51,945. For that amount an appropriation was promptly made. With the Secretary's report was transmitted to Congress that of the engineer in charge, who stated that " the question of land damages and water rights at the Great Falls still remains unsettled." The dam was completed to its present height in 1867, and is used as an indispensable part of the system by which the cities

of Washington and Georgetown have been supplied with water. Beyond doubt, the land and the water rights and privileges in question have for nearly twenty years been held and used by officers and agents of the government, without any compensation whatever having been made therefor to the claimant. By what authority have they appropriated to public use the property of the claimant? The answer to this question will determine whether the present demand of the claimant arises out of an implied contract, and, therefore, enforceable by suit against the United States in the Court of Claims.

It seems clear that these property rights have been held and used by the agents of the United States, under the sanction of legislative enactments by Congress; for, the appropriation of money specifically for the construction of the dam from the Maryland shore to Conn's Island was, all the circumstances considered, equivalent to an express direction by the legislative and executive branches of the government to its officers to take this particular property for the public objects contemplated by the scheme for supplying the capital of the nation with wholesome water. The making of the improvements necessarily involves the taking of the property; and if, for the want of formal proceedings for its condemnation to public use, the claimant was entitled, at the beginning of the work, to have the agents of the government enjoined from prosecuting it until provision was made for securing, in some way, payment of the compensation required by the Constitution—upon which question we express no opinion—there is no sound reason why the claimant might not waive that right, and, electing to regard the action of the government as a taking under its sovereign right of eminent domain, demand just compensation. *Kohl* v. *United States*, 91 U. S. 367, 374. In that view, we are of opinion that the United States, having by its agents, proceeding under the authority of an act of Congress, taken the property of the claimant for public use, are under an obligation, imposed by the Constitution, to make compensation. The law will imply a promise to make the required compensation, where property, to which the government asserts no title, is taken, pursuant to an act of Congress, as private property to

be applied for public uses. Such an implication being con- sistent with the constitutional duty of the government, as well as with common justice, the claimant's cause of action is one that arises out of implied contract, within the meaning of the statute which confers jurisdiction upon the Court of Claims of actions founded " upon any contract, express or implied, with the government of the United States."

This case is materially different from *Langford* v. *United States*, 101 U. S. 341. That was an action in the Court of Claims against the United States to recover for the use and occupation of certain lands and buildings to which the claim- ant asserted title. It there appeared that, throughout the whole period of such occupation and use, the title of the claimant was disputed by the government, and that possession was taken and held by its agents in virtue of a title asserted to be in the United States. The jurisdiction of the Court of Claims was attempted to be sustained upon the ground that the government, in taking and using the property of an individual, against his consent and by force, could not, under the relations between it and the citizen, commit a tort, but was under an implied obligation, created by the Constitution, to pay for the property, or for the use of the property so taken. This propo- sition was held to be untenable under the facts of that case, for the reason that, while individual officers of the government might be guilty of a tort, if the property so held by them was in fact private property, yet, if the government never recognized the property as private property, taken by its agents for public use, it could not be held liable for its value as upon implied contract. In the same case it was said: " We are not prepared to deny that when the government of the United States, by such formal proceedings as are necessary to bind it, takes for public use, as for an arsenal, custom-house, or fort, land to which it asserts no claim of title, but admits the ownership to be private or individual, there arises an implied obligation to pay the owner its just value. It is to be re- gretted that Congress has made no provision by any general law for ascertaining and paying this just compensation. And we are not called on to decide that when the government,

acting ˙by the forms which are sufficient to bind it, recognizes the fact that *it is* taking *private* property for public use, the compensation may not be recovered in the Court of Claims. On this point we decide nothing."

The question thus reserved from decision is substantially the one now presented. In the present case there were, it is true, no statutory proceedings for the condemnation of the claimant's property rights. Such proceedings, as has been stated, were instituted by the United States in one of the courts of Maryland, in which the property rights of the claimant were expressly recognized. But they were abandoned. One reason, perhaps, for such abandonment was that, in the judgment of ˙ the officers of the United States, a fair assessment of damages could not be had in the mode prescribed by the Maryland statute. Be this as it may, it is clear, from the record, that the government did not assert title in itself to this property, at the time it was taken.

Having abandoned the proceedings of condemnation, the proper officers of the government, in conformity with the acts of Congress, constructed the dam from the Maryland shore to Conn's Island, the doing of which necessarily involved the occupation and use of the property, as contemplated in what was called the fourth plan for bringing water from the Great Falls to Washington and Georgetown. In such a case, it is difficult to perceive why the legal obligation of the United States to pay for what was thus taken pursuant to an act of Congress, is not quite as strong as it would have been had formal proceedings for condemnation been resorted to for that purpose. If the claimant makes no objection to the particular mode in which the property has been taken, but substantially waives it, by asserting, as is done in the petition in this case, that the government took the property for the public uses designated, we do not perceive that the court is under any duty to make the objection in order to relieve the United States from the obligation to make just compensation.

In reference to the title which the government will acquire, as the result of this suit, there would seem to be no difficulty. The finding of the court is that the claimant exhibited to the

·arbitrators a valid title to the lands in question. It does not appear that the company has ever parted with that title; and the finding is that no title except that of the claimant is asserted.

What has been said is sufficient to dispose of the case, and requires      *An affirmance of the judgment. It is so ordered.*