REITZER et ux. v. MEDINA VALLEY IRRIGATION CO. et al.†

(Court of Civil Appeals of Texas. San Antonio. Jan. 8, 1913. Rehearing Denied Feb. 12, 1913.)

1. CORPORATIONS (§ 510*)—ACTIONS—INJUNCTION—PARTIES.

In an action to enjoin the overflowing of land by means of a dam, where it is not shown that the officers and employés of the corporation owning the dam were doing or threatening to do anything independent of the corporation, they are not necessary parties.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1930; Dec. Dig. § 510.*]

2. ESTOPPEL (§ 70*)—ACQUIESCENCE—INJUNCTION.

A party cannot have equitable relief by injunction, where he has acquiesced in the act sought to be enjoined by recognizing the act as existing, with full knowledge or notice, or means of knowledge, of his rights, or by acting in a manner inconsistent with its repudiation, or by permitting the other party to deal with the subject-matter under the belief that it has been recognized without objection.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 183–187; Dec. Dig. § 70.*]

3. EMINENT DOMAIN (§§ 79, 80, 280*)—COMPENSATION — PAYMENT BEFORE TAKING—WAIVER.

Where a landowner, knowing that a dam was being erected by a corporation entitled to exercise power of eminent domain, which would submerge his land, made no objection, but, on the contrary, assisted in building it and negotiated for the sale of the land, he waived prepayment of compensation before appropriation of the land under the power of eminent domain, and could not, after the corporation had taken possession of his land by overflowing it, enjoin the maintenance of the dam, but was only entitled to recover compensation for the land.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 205–214, 776; Dec. Dig. §§ 79, 80, 280.*]

4. EMINENT DOMAIN (§ 172*)—PROCEEDING TO TAKE PROPERTY—JURISDICTION.

A United States District Court has no authority to condemn land in this state for a foreign corporation acquiring its right to exercise the power of eminent domain under the laws of this state.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 470–472; Dec. Dig. § 172.*]

5. EMINENT DOMAIN (§ 167*) — STATUTORY PROVISION — NECESSITY OF STRICT COMPLIANCE.

Grants of the power of eminent domain are strictly construed, and the methods set forth in the statute granting the power must be strictly followed.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 451–456; Dec. Dig. § 167.*]

6. EMINENT DOMAIN (§ 280*)—COMPENSATION—PAYMENT BEFORE TAKING—WAIVER BY HUSBAND.

A married woman could not enjoin the maintenance of a dam by a corporation entitled to exercise the power of eminent domain, which would submerge the land of her husband, in which she had a homestead right, where the husband had waived prepayment of compensation before appropriation of the land, but was only entitled to recover compensation for her homestead.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 776; Dec. Dig. § 280.*]

Appeal from District Court, Medina County; R. H. Burney, Judge.

Action by Albert Reitzer and wife against the Medina Valley Irrigation Company and others. From a judgment in favor of defendants, plaintiffs appeal. Affirmed.

C. L. Bass, Shook & VanderHoeven, and E. Pendleton Lipscomb, all of San. Antonio, and R. E. Brooks, of Houston, for appellants. L. G. Denman and Wm. Aubrey, both of San Antonio, for appellees.

FLY, C. J. This is a suit by Albert Reitzer against the Irrigation Company, Thomas B. Palfrey, C. H. Kearney, White Caldwell, Willis Ranney, Frank Carson, Fagan, Elwood, Terley, Kelley, Neil Henson, C. Lamadoux, and "Crusher Bill" to compel them to open the dam on the Medina river, in Medina county, in a way to cause the waters accumulated and to accumulate above it to flow rapidly through it, so "that there will be no danger from water impounded in the reservoir by it of injuring or destroying the land, riparian rights, personal property, and body of plaintiff, as well as the bodies of plaintiff's family, until the writ of injunction is modified, altered, or dissolved," and to cause appellees to "desist and refrain from building the dam any higher than it is now, so long as by doing so the dam would be liable to impound waters in the reservoir in such quantities and volume that same would endanger the land, riparian rights, and personal property of plaintiff, as well as the lives and bodies of plaintiff and family." Attached as exhibits to the petition are two letters, one dated May 7, 1912, and the other June 18, 1912, in which the Irrigation Company admitted that the dam would back the waters over the lands and houses of appellants, and a desire is expressed to pay for the property the damages assessed by disinterested arbitrators; their award to be final. The company also offered to advance enough money to move or replace the improvements on the land and defray other expenses. Appellant pleaded that he owned 253.4 acres of land lying on the Medina river, on which he has a dwelling, outhouses, fences, and other property; that the land lies in such a position that the waters caught and held by the dam would flood it, and that the land is worth more than $100 an acre, and the personal property more than $1,000; that the impounded waters have already covered a portion of appellant's land. On August 9, 1912, an order was issued, commanding appellees "to open all openings, floodgates, and other exits for water in said dam in such way as not to cause waters of the Medina river to overflow any or all of plaintiffs' said lands." On August 12, 1912, appellees filed a petition for removal of the cause to the District Court of the United States for the Western District of Texas, on the grounds that the amount in controversy exceeded $3,000, and that the Irriga-

tion Company was a citizen of the state of Colorado; that the other defendants were officers, employés, and agents of the company, and have no right, title, or interest in the dam. It was also alleged that a suit had been filed by the Irrigation Company in the federal court to condemn the land of the plaintiff. On August 15, 1912, the district judge ordered the cause removed to the federal court. On August 29th the cause was remanded by the federal court to the state district court. In the answer it was alleged that Albert Reitzer had estopped himself by his acts from obtaining the relief sought by him, and the relief prayed for by Reitzer would result in the destruction of the dam and cause damage in not less than $1,000,000. The wife of Reitzer joined in a supplemental petition, in which it was alleged that the land was the homestead of appellants. The cause was heard on October 29, 1912, and it was ordered that the temporary restraining order "be set aside and revoked."

The following findings of fact, set out in the decree of the district judge, are adopted by this court:

"Albert Reitzer and wife, Adelheid Reitzer, are residents of Medina county, Tex., and the owners of the property in controversy in this suit, and reside on it as a homestead, as alleged in their petition. The defendant herein, the Medina Valley Irrigation Company, is a corporation duly chartered and incorporated under the laws of the state of Colorado and has a permit from the Secretary of State to do business in this state.

"The said defendant, the Medina Valley Irrigation Company, is the owner of and succeeding to all of the rights and properties of what was known as the Medina Irrigation Company. The transfer by the said Medina Irrigation Company to the Medina Valley Irrigation Company of Colorado was effected on March 21, 1912, and included all of the rights and properties in and to the dam and irrigation properties and premises.

"The said Medina Irrigation Company of Texas and the other individual defendants named in plaintiffs' petition have not answered herein, and they are not necessary parties to the determination of any matter involved in this suit and have no interest in the matters involved, save and except such as may arise on the part of some of the individual defendants named, arising out of the fact that they are the agents or employés of the Medina Valley Irrigation Company.

"The said Medina Valley Irrigation Company, a corporation duly chartered under the laws of the state of Colorado, did, on July 5, 1912, institute and file in the District Court of the United States, at San Antonio, Tex., a suit or proceeding wherein said corporation is the plaintiff and Albert Reitzer and wife are made the defendants, and wherein it is sought to have the same lands described in plaintiffs' petition in this case condemned for reservoir and irrigation purposes; it being alleged in said suit that said lands are of the value of not less than $4,756. In said suit in the United States court said Medina Valley Irrigation Company sets up and alleges that it is chartered for irrigation purposes, and for the purpose of building dams, constructing storage reservoirs, for milling and waterworks purposes, and other matters; and, further, that it has the right of eminent domain under the laws of Texas. On July 12, 1912, citation was duly issued in said cause by the clerk of said court, and served upon Albert Reitzer and wife, Adelheid Reitzer, three weeks prior to the presentation to the district judge of the petition in this cause."

The facts show, in addition, that Reitzer knew, in April or May, 1911, before work began on the dam, that it would cause water to flood his land. He not only knew that, but assisted in building the dam and negotiated for a settlement in the fall of 1911. The dam is a mile from the nearest point on Reitzer's land. He swore: "I always knew, if the dam was completed, it was going to take my land; that the object of the dam was to cover my land with the lake of water. I didn't object to it, because I always thought they would pay me for my land, and I would give it to them and let them have it. The trouble between us now is that they are not offering me as much as I want for the land. If they paid me all I want for the land, I would move out now. I never objected to them building that dam. I wanted them to pay me money and buy my land, and that is what I want right now." The Irrigation Company offered to pay Reitzer $4,756.95 for the land that would be submerged. No objection was ever made by Reitzer to the building of the dam, which caused an expenditure of nearly $1,000,000.

[1] The evidence supported the finding of the trial judge that none of the defendants, except the Medina Valley Irrigation Company, had any interest in the dam or the property belonging to it. It is not shown by appellants that the officers and employés of the corporation were doing, or threatening to do, anything independent of the corporation; and everything that could be desired to be accomplished by appellants could be done as well by restraining the corporation alone as by restraining a defunct corporation and a number of employés, many of whom, doubtless, have severed all connection with the corporation. The evidence clearly shows that the corporation built the dam, and, as alleged by it, the men who were joined with it in the suit were merely the necessary agents employed by it to forward the purposes for which the corporation was chartered. As said by Judge Shiras in a case where a corporation and its president

and directors were made joint defendants: "In the case now under consideration it is not proven that the defendant corporation is insolvent, nor that the defendants Lunn, Miller, Dawson et al., as individuals, have violated any rights of complainants, or that they, by manufacturing and selling harrows, which are infringements of the Perkinson patent, have deprived complainants of any gains, or that they have themselves reaped any profits therefrom. All the acts charged against them are acts done in carrying on the business of the corporation, for the benefit of the corporation and its stockholders; and under such circumstances no reason is perceived why a decree, either for an accounting or for an injunction, should be rendered against them as individuals. The decree for an injunction against the corporation is binding upon its officers and agents, without making them personally parties to the bill; and so, also, the decree for an account can be made fully operative without their presence as parties." Howard v. St. Paul Plow Works (C. C.) 35 Fed. 743; Beach on Inj. § 1348. Allegations of a conspiracy between a corporation and its employés to build a dam present no reason for joining the employés with the corporation in the suit. It is a novel proposition that employés of a corporation can conspire with it to accomplish the very thing for which it was incorporated. It would seem that the reason for joining the officers and employés was to accomplish a purpose other than that alleged in the petition, and that reason is apparent. There was no evidence of a conspiracy. The employés were not necessary parties.

[2] The remedy by injunction is exclusively equitable, and the party applying therefor must show himself entitled to the same, under the rules of courts of equity. One of those rules is, "He who comes into equity must come with clean hands;" and another is, "He who seeks equity must do equity." Acquiescence is an important factor in determining the equitable rights and remedies in obedience to the foregoing maxims. "Acquiescence in the wrongful conduct of another, by which one's rights are invaded, may often operate, upon the principles of and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled." Pomeroy, Eq. Jur. § 817. Acquiescence may be shown from mere silence, and may operate as an estoppel. Mere submission to an injury would not constitute acquiescence, but it may arise from knowledge of the transaction, knowledge of the party's rights, absence of any restraint, and consequent freedom of action. There need not be any intention to ratify the transaction. "When a party with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and of all the material facts, freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a considerable time and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity." Pomeroy, Eq. Jur. § 965. The text is fully sustained by a long list of authorities. Acquiescence may also arise from unnecessary delay in commencing equitable proceedings for relief, after full knowledge of all the facts surrounding a transaction.

[3] The facts clearly estop Reitzer from obtaining an injunction that would practically destroy property erected by the Irrigation Company. He not only knew that the dam was being erected, but he hired himself and team to the company and assisted in building it, knowing that it would submerge his land. Railway v. Sutor, 56 Tex. 496; Oswald v. Grenet, 22 Tex. 94. His acts had the same effect as though he had given formal consent to the taking of his land; and he has no cause of action against the corporation, except for the damages resulting from the taking of his land.

The right to compensation for land, before it is appropriated under the power of eminent domain, is one which, like a vast number of rights, may be waived. The owner may waive prepayment; and acquiescence in the taking, without insisting upon prepayment, has been held to amount to such waiver. Lewis, Em. Dom. § 455; Lewis v. Seattle, 5 Wash. 741, 32 Pac. 794; Road Co. v. Orr, 67 N. H. 541, 41 Atl. 665; United States v. Great Falls Mfg. Co., 112 U. S. 645, 5 Sup. Ct. 306, 28 L. Ed. 846; High on Inj. 618.

There is no allegation of insolvency of the corporation, and appellant has an adequate legal remedy for the flooding of his land and the destruction of his property; and, after leading the corporation to make vast expenditures of money, he cannot destroy such property with the aid of a court of equity. As said by High in his work on Injunctions (section 643): "And where the owner of land over which a railroad has been constructed has stood quietly by and neglected to insist upon compensation at the time his land was taken, and has waited until the road was in full operation before asserting his rights, he will not be permitted to restrain its operation; his only remedy being to have his damages assessed and enforced against the railroad." A number of authorities are cited to sustain the language used by the writer, in one of which (Goodwin v. Railway, 18 Ohio St. 169, 98 Am. Dec. 95) it is said: "Considerations of public policy, as well as recognized principles of justice between parties, re-

quire that we should hold in such cases that the property cannot be reclaimed, and that there only remains to him a right of compensation. The injunction in the present case might have been sought at the first known attempt, or even threat, to despoil the canal, or to construct the railroad upon its line. The omission to do so is an implied assent. The work being completed, the public, as well as those directly interested in the road as stockholders and creditors, have a right to insist on the application of the rule that he who will not speak when he should will not be allowed to speak when he would."

In the case of Roberts v. Northern P. R. R. Co., 158 U. S. 1, 15 Sup. Ct. 756, 39 L. Ed. 873, it was said: "So, too, it has been frequently held that if a landowner, knowing that a railroad company has entered upon his land, and is engaged in constructing its road without having complied with the statute requiring either payment by agreement or proceedings to condemn, remains inactive and permits them to go on and expend large sums in the work, he will be estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and be restricted to a suit for damages."

In the case of Penn Mutual Life Ins. Co. v. City of Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626, it was held: "The requirement of diligence, and the loss of the right to invoke the arm of a court of equity in case of laches, is particularly applicable where the subject-matter of the controversy is a public work. In a case of this nature, where a public expenditure has been made, or a public work undertaken, and where one having full opportunity to prevent its accomplishment has stood by and seen the public work proceed, a court of equity will more readily consider laches." The laches referred to is not a matter of time, but is principally a question of the injustice of permitting one to sit by until money has been largely expended, and then seek, through an equitable remedy, to destroy the sums invested.

The authorities, state and federal, are reviewed in New York v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, and the court held in consonance with the quotations herein made. Authorities on the subject are overwhelming. In the Pine Case the Supreme Court conservatively says: "These views do not justify the conclusion that a court of equity assumes a general right to ignore or supersede statutory provisions for the ascertainment of the amount of compensation in cases of condemnation. They simply mean that a failure to pursue statutory remedies is not always fatal to the rights of the party in possession, and that sometimes, if full and adequate compensation is made to the plaintiff, the possession of the defendant will not be disturbed." In the case now at bar the Irrigation Company is willing and

anxious to pay for the land, and if appellants sought to recover their damages they would be decreed by the district court, and an injunction awarded in case they were not paid. Or, if appellants sought such relief, the district court, under its ample powers, could require the Irrigation Company to give a sufficient bond to secure appellants in their damages, whether they were ascertained by the federal court or in any other way. The court has ample power to protect appellants in all their rights by the exercise of legal remedies, and appellants are in no position to invoke the equitable remedy of injunction at this time. Whenever the time arrives, the courts of Texas will be prompt to exert all of their powers, legal and equitable, to protect appellants in their rights to their property.

[4, 5] We feel indisposed to indorse the ruling of the district judge that the District Court of the United States has the authority to condemn land in Texas for a foreign corporation, although it has been so held by the Supreme Court of the United States in the case of Madisonville Traction Co. v. St. Bernard Mining Co., 196 U. S. 239, 25 Sup. Ct. 251, 49 L. Ed. 462. That decision was rendered by five judges, and a vigorous dissenting opinion was concurred in by Chief Justice Fuller, Justice Brewer, Justice Holmes, and Justice Peckham. The statute of Texas does not contemplate or provide for any such procedure; but the state has authorized the exercise of the power of eminent domain by the use of certain machinery, and, as stated in the dissenting opinion, the taking of property would be illegal if use was made of any other agencies than those provided for by the state. We believe the attempted exercise of the power of condemnation of the property of the citizen of a state by a federal court is without sanction of law or warrant of authority, and is an invasion of the sovereignty of the state and the rights of its citizens. No other officer is granted the power by the statutes of Texas to receive the petition for condemnation, or appoint commissioners to assess the damages, except the county judge; and he alone can try the cause if there is dissatisfaction with the award of the commissioners. All such grants of power are strictly construed; for the power of eminent domain is very harsh and peremptory, and the methods set forth in the statute granting such power must be strictly followed. This is the universal rule in the American states. State v. Jersey City, 54 N. J. Law, 49, 22 Atl. 1052; Lewis on Em. Dom. § 253, and the large number of decisions cited in the footnote.

It is held in the federal case cited that an original suit for condemnation can be instituted in a federal court, when there is diverse citizenship, although there is no provision in the laws of the state for the exercise of any such power, and yet with re-

markable inconsistency it is declared that the only authority for condemning the property of the citizen must come from the state. The authority of the state alone to condemn private property is accorded to it, but the procedure to so condemn provided by it can and will be ignored. We think the dissenting opinion of Justice Holmes is correct in holding "that if a state authorizes a taking to be accomplished by certain machinery the United States have no constitutional right to intervene and to substitute other machinery, because the state has chosen to use its law courts rather than a legislative committee, and thus to give to the exercise of its sovereign power the external form of a suit at law. * * * The exercise of that power depends wholly on the state, may be limited as the state chooses, and cannot be carried further than the state has authorized in terms." The proposition seems too clear to admit of argument; and, while an opinion on this matter is not absolutely demanded by the facts of this case, we do not feel disposed to have this court placed in the position of even acquiescing by silence in a decision deemed by us to be a direct attack upon the sovereignty of this state. This is not intended as any reflection upon the conscientious district judge who tried this cause; nor is it condemnatory of any anticipated action that may be taken by any District Court of the United States in obedience to its superior, from which it must receive the law. But we must firmly and forcibly protest against the invasion of state rights and the unconstitutional taking of the citizen's property, which has been sanctioned by a temporary majority, we trust, of the Supreme Court of the United States.

Under the facts in this case, we think it clear that Albert Reitzer has no equities upon which to base the right to the remedy of injunction, but he has waived such right, and he has a legal remedy in a suit for damages that is full and adequate in redressing any wrongs that he has suffered or will suffer. He has no right to destroy a mighty enterprise authorized by the laws of the state, which he has allowed to be completed and carried to its final consummation, merely to collect what he may deem compensation for property, in whose taking he has not only acquiesced, but assisted. He clearly indicates in his testimony that he is not seeking the preservation of his property, but the sale of it at a high value.

[6] It appears from the testimony that the property in controversy is the homestead of Reitzer and wife, and she testified that she did not know about how much land the dam would flood. She does not deny that she knew that it would flood a part or all of her homestead. Whether she knew or not does not matter. Her homestead was subject to condemnation for the purposes of a dam, and the question arises: Shall she be granted a writ of injunction to open up and practically destroy the dam, or will she be granted every right to which she is entitled by paying her the full value of her homestead? Her homestead was at the mercy of the corporation clothed with the power of condemnation by the state, and the waiver of her husband would bind her, not because he had any power or authority to grant her homestead, but because he had the right to waive the procedure by which it was to be taken for a public use. All that can with reason be demanded is just compensation for her homestead, which would have been taken without her consent under the statute of eminent domain, and which will not be taken any more effectually by the waiver of her husband. The same rights of condemnation of property are conferred on irrigation companies as on railroad companies, such property to be assessed and paid for as provided in cases of railroads. Article 5004, Rev. Stats. 1911. In article 6504 the authority is given railroads to condemn land, if unable to agree with the owner for the purchase of real estate or the material thereon. In a New York case (Embury v. Conner, 3 N. Y. 511, 53 Am. Dec. 325), under a similar statute, it was held that the Legislature had removed the disability of coverture by enacting that lands might be taken upon consent of the owners without making any exception, and an oral agreement would bind the married woman. Speaking of that decision, the Supreme Court of Texas, in the case of City of San Antonio v. Grandjean, 91 Tex. 430, 41 S. W. 477, 44 S. W. 476, said: "Under that construction it was held that a married woman had the power to consent to the taking, and that no deed was necessary in such case to operate a transfer of her property." It is also said in that case: "Enlightened governments provide always for compensation to the owner, and in our state, as in many others, the payment of the compensation is made a condition precedent to the taking. But, at last, it is essentially a right to take, and does not involve the necessity of any grant or conveyance on the part of the owner, or any judicial decree."

In this case the Irrigation Company did not seek to purchase the land of a married woman, but sought to and did obtain it by consent under the statutes authorizing condemnation of land; and her land was subject to the right of eminent domain, which is superior to homestead or any other rights appertaining to real estate. It is true that in the Grandjean Case the married woman had accepted the compensation for her land; but acceptance was merely a circumstance tending to show consent to the taking, and any other acts tending to show consent would be just as binding. Grace v. Walker, 95 Tex. 39, 64 S. W. 930, 65 S. W. 482.

It is too heavy a tax on credulity to entertain the proposition that Mrs. Reitzer, living

within a mile of the stupendous dam, that was doubtless the wonder of the rural community in which she lived, did not know what its effect would be; and it would be an insult to her intelligence to believe that she could remain in such proximity to the dam without learning of the vast accumulation of water it would cause, with its probable effect on her land. She has not been deprived of her homestead yet, for that depends on compensation; but we hold that she has not placed herself in a position to use an injunction as an engine of destruction of property, but must now be content with obtaining the market value of her property.

The Irrigation Company does not, and could not if it would, claim the land of appellants through any conveyance by them, oral or otherwise, but it claims through the right of eminent domain, with which it is clothed by the laws of Texas; and, having taken possession of the land by consent, its possession will be fully rounded out and rendered complete and exclusive by payment of the compensation. It follows that the cases on estoppel of married women, referred to by appellants, have no application whatever in cases in which the right of eminent domain is exercised.

We conclude there was no error in refusing the restraining orders sought by appellants, and consequently the judgment of the district court is affirmed.