218 F.2d 518
 UNITED STATES of America, Appellant,
v.
2,648.31 ACRES OF LAND, MORE OR LESS, IN THE COUNTIES OF CHARLOTTE AND HALIFAX, VIRGINIA, J. P. Stevens and Company, Inc., et al., and unknown owners, Appellees.
 No. 6833.
 United States Court of Appeals, Fourth Circuit.
 Argued October 13, 1954.
 Decided January 5, 1955.
 
 Fred W. Smith, Atty., Department of Justice, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., John Strickler, U. S. Atty., Roanoke, Va., and Roger P. Marquis, Atty., Department of Justice, Washington, D. C., on brief), for appellant.
 James S. Easley, South Boston, Va. (Easley, Edmunds & Vaughan, South Boston, Va., on brief), for appellees.
 Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.
 PARKER, Chief Judge.
 
 
 1
 This is an appeal by the United States from a judgment awarding compensation in a proceeding for the condemnation of flowage easements over three certain tracts of land in connection with a flood control project, the John H. Kerr Dam and Reservoir on the Roanoke River in Virginia and North Carolina. The trial judge held that the owners were entitled to recover the fee simple value of the several tracts, amounting to $58,000, $9,000 and $10,000 respectively, and excluded testimony offered by the government tending to show that the decrease in the value of the several tracts due to the acquisition of the flowage easements by the government was only $15,000, $2,000 and $3,000 respectively. The question in the case is the proper measure of compensation for the taking of a flowage easement over land.
 
 
 2
 The declaration of taking shows clearly that only flowage rights over the lands were being taken, that these flowage rights were taken with respect to a particular dam which was being built for flood control purposes, with a showing of the contour of the lands which would be in any way affected by the construction and with a reservation to the owners of the right to make any use of the lands which would not interfere with the flowage rights which were being condemned. The pertinent portion of the declaration of taking is as follows:
 
 
 3
 "The full, complete, and perpetual right, power and privilege to overflow, permanently or intermittently, as may be necessary as a result of the construction, maintenance and operation of the John H. Kerr Dam and Reservoir, (describing the lands) together with the right, power and privilege to go upon the lands involved from time to time as the occasion may require to accomplish any activities in connection with the maintenance and operation of the John H. Kerr Dam and Reservoir and to remove from said lands natural or artificial structures or obstructions which, in the opinion of the representative of the United States in charge, may be detrimental to the maintenance and operation of said project, reserving, however, to the owner(s) and their assigns, all such rights and privileges as may be used and enjoyed without interfering with or abridging the rights and easements acquired by the United States, subject, however, to existing easements for public roads and highways, for public utilities, for railroads and for pipelines.
 
 
 4
 "4. The plan showing the lands taken is annexed hereto as Schedule `B' and made a part hereof.
 
 
 5
 The government offered proof, which was excluded, as to the extent to which the tracts in question would actually be flooded, either permanently or intermittently, by operation of the project. The offer of proof is accurately summarized in appellant's brief as follows:
 
 
 6
 "Included in the offer was a report by the District Engineer, Corps of Engineers, U. S. Army, Norfolk, Virginia, describing the dam and reservoir as actually constructed and the operation of the same, showing that the elevation of the spillway was 288 feet, and that with the spillway gates closed the top elevation of the dam would be at elevation 320 feet. The report further stated that `the space from elevation 300 [the power pool level] to 320 will be reserved for flood water storage' and that `The land above elevation 310 will be inundated so rarely that it could be used for farming.' Thus water is retained in the reservoir above elevation 300 only during flood conditions, and it was made clear to the court below and to opposing counsel at the hearing that as soon as conditions permitted the pool would be pulled down to power pool or 300 feet elevation. Included in the offer of proof is a map in color showing the 320-foot contour on the three tracts in question, the areas below that level being colored yellow. That map shows that no part of Tract KK-3621E is below that level, and that only small portions of Tracts NN-3918E and NN-3939E are below that level. Thus the Government offered to prove that no part of Tract KK-3621E could be overflowed permanently and that only very small portions of the other two tracts `will be overflowed permanently, except as have otherwise been overflowed naturally.' And in paragraph 5 the Government offered to prove that `it will be impossible physically to overflow these three tracts permanently' and `it will also be impossible physically to overflow even a portion of them intermittently to any materially greater extent than that to which they have always been subject by natural flooding.' On the question of natural flooding of the three tracts here involved, the Government offered to prove by records of the Weather Bureau the frequency and elevations of past natural floods opposite the tracts during the period 1901 to 1952, and on that subject a detailed `Record of Flood Heights on Roanoke (Staunton) River Near Randolph and Clover, Va.' was offered as an exhibit. Finally the Government offered the evidence of witnesses to prove that the value of the easements, on the basis of actual flooding due to operation of the dam, was $3,000 as to Tract KK-3621E, $2,000 as to Tract NN-3918E, and $15,000 as to Tract NN-3939E."
 
 
 7
 We think that the learned trial judge was in error in excluding the proof thus offered and in holding that the landowners were entitled to recover the fee simple value of the lands over which only flowage rights were being taken. A flood control project, such as was being constructed by the government, will necessarily cause the permanent flooding of some lands but as to others only intermittent flooding as the result of delayed run-off when flood conditions prevail in the river. Lands not permanently but only intermittently flooded can be used by the owner almost as satisfactorily as if the project were not in existence and the extent of the intermittent flooding and its effect upon the value of the land can be as readily determined as any of the other matters ordinarily involved in determining compensation. In such a situation there is no reason why the government should condemn and pay for anything more than the flowage rights for these intermittent floodings and no reason why the compensation to be awarded therefor should be anything other than the difference in the value of the land with and without the flowage easement.
 
 
 8
 In United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 385, 61 L.Ed. 746, there was involved the question of the government's liability for periodic flooding incident to the operation of a lock and dam which formed part of a government navigation project. After pointing out that the periodic flooding was a "permanent condition" in that the land would be subject to such flooding as the operation of the dam necessitated, the court proceeded to make clear that the recovery should be limited to the value of the easement so taken. The court said:
 
 
 9
 "If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land. The taking by condemnation of an interest less than the fee is familiar in the law of eminent domain. Where formal proceedings are initiated by the party condemning, it is usual and proper to specify the precise interest taken, where less than the fee. But where, as in this case, the property owner resorts to the courts, as he may, to recover compensation for what actually has been taken, upon the principle that the government, by the very act of taking, impliedly has promised to make compensation because the dictates of justice and the terms of the 5th Amendment so require (United States v. Great Falls Mfg. Co., 112 U.S. 645, 656, 5 S.Ct. 306, 28 L.Ed. 846, 850; United States v. Lynah, 188 U.S. 445, 465, 23 S.Ct. 349, 47 L.Ed. 539, 546), and it appears that less than the whole has been taken and is to be paid for, such a right or interest will be deemed to pass as is necessary fairly to effectuate the purpose of the taking; and where, as in this case, with respect to the 66/10 acres, land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the lock and dam for purposes of navigation."
 
 
 10
 In Karlson v. United States, 8 Cir., 82 F.2d 330, 335, the court held that it was error to reject testimony as to the operation of a reservoir (being operated under the provisions of a treaty) as bearing upon the extent of the interest taken. The question was exhaustively considered in an able opinion by Judge John B. Sanborn who, in the course thereof, laid down the rule which we think should be applied here. He said:
 
 
 11
 "It seems fairly obvious that, for the benefit of the power interests on the Winnipeg river, the discharge of water from the lake is to be uniform and continuous during all the time that the levels of the lake are within the ordinary treaty range, while, on occasions of low precipitation or extreme precipitation, when the lake falls to the extreme low level or goes above the ordinary range of levels, the outflow is to be controlled in such a way as to bring the lake levels back within their ordinary treaty range. In any event, if the Treaty is adhered to, as it must be presumed that it will be, the extreme or emergency high level of the lake cannot be maintained continuously, since that could only be done in disregard of the provision of the treaty as to ordinary levels and as to uniform and continuous discharge of water.
 
 
 12
 "There is no way of determining from the Act of Congress authorizing the acquisition of the easement, or from the Treaty itself, for how long or during what periods the extreme high or extreme low or ordinary range of levels will prevail. To determine what the probable effect of the imposition of this easement will be upon these lands, it is necessary to consider other factors, such as the amount of annual precipitation in the territory which drains into the lake, the yearly and seasonal variations in precipitation which have occurred in the past and will therefore in all probability occur in the future, and their effect upon lake levels during the growing season.
 
 
 13
 "In these cases, the petitioner is asking for and will receive no greater right to flow these lands than is authorized by the Treaty. If, in the future, a greater servitude should be placed upon these lands than that which is now authorized, we have no doubt that the respondents will be entitled to additional compensation if the value of their lands is adversely affected thereby. Whether the imposition of this easement deprives the respondents of all of the value which inheres in their lands below elevation 1062.5 and leaves them with nothing but a naked legal title, was a question of fact for the jury and not a question of law for the court."
 
 
 14
 In the case before us, the government is asking for and will receive no greater right to flow the lands than is necessitated in the proper operation of the flood control dam, which with the contour of the lands that will be affected by it is described in the declaration of taking, just as in the Karlson case the petitioner was asking for and would receive no greater right to flood the lands than authorized by the treaty. If in the future, to paraphrase the language of Judge Sanborn, a greater servitude should be placed upon these lands by changes in the dam, we have no doubt that the owners will be entitled to additional compensation if the value of the lands is adversely affected thereby.
 
 
 15
 As the evidence shows that the effect of the proper operation of the dam here as a flood control dam is to flood only intermittently (and that in time of flood) the greater portion of the lands involved, the following quotation from the decision in Alabama Power Co. v. Carden, 189 Ala. 384, 66 So. 596, quoted with approval by Judge Sanborn, is directly in point, viz.:
 
 
 16
 "`If the effect of the dam at lock 12 was to submerge the stated area upon occasions of flood only, the appellee would have left in him the right to use the land, consistent with the condemnor's right thereto, for any purpose to which he could devote it. Where the owner, after condemnation, "retains substantial rights in the property, he cannot insist on their value being included in the measure of his compensation." 10 Am & Eng.Ency. of Law, p. 1150; 2 Lewis on Eminent Domain, § 746. The owner is only entitled to be compensated for that taken and other remaining property injuriously affected in consequence. Accordingly, if the jury should find that the area was to be actually submerged upon occasions of flood only, and that these occasions would leave to the owner opportunity for its use to his own advantage, the measure of the compensation as for the property (area) thus taken is the value of that area before and after condemnation. Under such circumstances to require the condemnor to compensate for the whole value of the area thus appropriated would necessarily afford the owner a remuneration for that of which he has not been deprived.'"
 
 
 17
 In point also is the decision of the Court of Appeals of the 8th Circuit in Union Electric Light & Power Co. v. Snyder Estate Co., 8 Cir., 65 F.2d 297, where in an opinion by Judge Gardner, that court reversed the court below for allowing recovery as for a permanent flooding up to an elevation of 670 feet, where the evidence showed that that level would be reached only in time of flood. The owners attempt to distinguish that case on the ground that the condemnor there disclaimed any intention of flooding the land up to the 670 foot elevation except in time of flood; but the disclaimer there amounts to no more than the limitation here in the declaration of taking, wherein it appears that it is a flood control dam that is being constructed and that the maximum flooding, even for intermittent periods, is within the contours shown.
 
 
 18
 In United States v. Willis, 4 Cir., 141 F.2d 314, 315, this court dealt with a condemnation case in which intermitting flooding was involved. In that case we approved a finding of the lower court that there was only a partial taking as to the land intermittently flooded. The court, speaking through Judge Soper, said:
 
 
 19
 "The same evidence supported the valuation placed by the District Judge upon the higher strip of land which bordered the river at its new level and lay above the narrow strip which was permanently submerged by the operation of the new dam. It was admitted in the pleadings that in the normal functioning of the dam the waters in the pool above the dam vary in height from 590 to 595 feet above sea level and that within this 5 foot area lay 1.009 acres of the plaintiff's land. The District Judge accordingly found that this strip was subjected to occasional flooding. He found as in the case of the lower strip that the fair market value of the land was $1,000 per acre and also that the damages suffered by the plaintiff by the occasional flooding amounted to a taking of one-half of the fair market value of the property, or $504.50. It is established that a permanent intermittent overflow of land is a partial taking for which the taker is bound to make just compensation to the owner."
 
 
 20
 It is perfectly clear that all the government sought to acquire or did acquire by the taking here was an easement to flood the land for the purpose of the flood control dam, and we think it a clear case for the application of the rule that "where only an easement is taken, the fact that the fee remains in the landowner must be taken into consideration, the entire fee or rental value not being recoverable." 20 C.J. p. 758, 29 C.J.S.Eminent Domain, § 152, page 1011. "When land is flowed for the development of water power, the owner's damage for its taking is measured by the difference between the value of his land after the condemnor has flowed it and what it would have been worth on the date of its taking if the defendant's dam had not been built; that is the difference between the value of the land free from, and subject to, the rights taken". 18 Am.Jur. 890. See also Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142; United States v. Dickinson, 4 Cir., 152 F.2d 865, 869, affirmed 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789; United States v. 10.08 Acres of Land, D.C., 46 F.Supp. 138, 139; Cheves v. Whitehead, D.C., 1 F.Supp. 321; Emmons v. Utilities Power Co., 83 N.H. 181, 141 A. 65, 58 A.L.R. 788.
 
 
 21
 It is argued that under the declaration of taking the right to flow "permanently" as well as "intermittently" the lands described in the declaration is acquired, and reliance is placed upon the elementary rule that compensation must be made once for all and must be estimated according to the full measure of the right acquired. See Western Union Telegraph Co. v. Polhemus, 3 Cir., 178 F. 904, 29 L.R.A.,N.S. 465. The answer is that the declaration of taking here limited the effect of the language relied on to such permanent and intermittent flooding as would result from the maintenance and operation of the flood control dam. It is elementary that the language of any instrument must be construed with reference to the subject matter with which it deals. Here there was a taking of flowage rights necessary to the functioning of a flood control dam described with the contour of the lands affected by it in the declaration of taking. The reasonable meaning of the language relied on is not that the government was taking the right to flood permanently all of the lands described but was taking the right to flood permanently such portions of them as might be necessary in the proper operation of the dam and to flood the remainder only intermittently. As a practical matter there would be permanent flooding only of the lands that would be covered when the water in the reservoir was at operational level. There would be intermittent flooding of other areas when flood conditions prevailed. Everyone understood this, and the declaration of taking reserved to the owners the right to continue to use the lands. We were told at the bar that they are continuing to use them and we see no basis in law, in reason or in common honesty why they should collect from the government the full value of land in which they have reserved rights and which they are continuing to use merely because the government has acquired an easement with respect to flowage rights.
 
 
 22
 Under the statute, 40 U.S.C.A. § 258a, the government acquired the right to flood the lands under the declaration of taking to the extent described therein. The meaning of the language of the declaration is under attack but whatever ambiguity exists will be made perfectly clear by the evidence offered by the government which may be considered for this purpose on the remand of the case, and thereby the extent of the right to flood, which is being acquired the government, will be definitely fixed. This should be made clear also in the judgment so that there may be no question as to the landowner's right to recover if, in the future, there is greater flooding as the result of changes in the structure or the operation of the dam.
 
 
 23
 For the reasons stated, the judgment appealed from will be reversed and the case will be remanded for further proceedings not inconsistent herewith.
 
 
 24
 Reversed.